# **RECORD IMPOUNDED**

## **NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5220-18T1

T.C.G.,

    Plaintiff-Respondent,

v.

R.G.G., JR.,

    Defendant-Appellant.

_____

Argued telephonically June 1, 2020 –
Decided August 13, 2020

Before Judges Rothstadt and Moynihan.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FV-02-0080-20.

Peter John Koulikourdis argued the cause for appellant (Koulikourdis & Associates, attorneys; Peter John Koulikourdis and Thomas T. Kim, on the briefs).

Matthew Wayne Johnson argued the cause for respondent (Sherwood & Johnson, LLC, attorneys; Matthew Wayne Johnson and Aislinn M. Koch, on the brief).

PER CURIAM

Defendant R.G.G.[1] appeals from the Family Part's July 24, 2019 order granting his former wife, plaintiff T.C.G. a Final Restraining Order (FRO) under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. The trial court entered the order after finding defendant committed the predicate act of harassment, see N.J.S.A. 2C:25-19(a)(13) and N.J.S.A. 2C:33-4(a) and (c). On appeal, defendant argues that there was insufficient evidence to support the court's finding of harassment or that there was an immediate need for an FRO to protect plaintiff from further abuse, especially in light of plaintiff not providing "clear testimony" that she was seeking an FRO. We affirm substantially for the reasons expressed by the trial court in its oral decision placed on the record prior to the entry of the order under appeal.

The facts developed at the final hearing are summarized as follows. The parties married in 1998. They had one child that was born in 1998 and another in 2001. Defendant filed for divorce on October 25, 2017. Prior to the entry of a final judgment of divorce, (JOD), the parties entered into a Custody and Parenting Time Agreement (Agreement) on March 2, 2018, that became part of

---

[1] We use initials to protect the identity of victims of domestic violence and to preserve the confidentiality of these proceedings. R. 1:38-3(d)(9) to (10).

their October 18, 2018 Marital Settlement Agreement (MSA), which was incorporated into their JOD that was filed on the same day.

Prior to their divorce, in 2016, plaintiff filed a domestic violence complaint, alleging that defendant committed the predicate acts of harassment and terroristic threats, N.J.S.A. 2C:12-3 in response to plaintiff going out to dinner without defendant. The complaint alleged, among other things, that defendant sent plaintiff text messages threatening to "to drag her out of dinner," which placed her "in fear [for] her life" as she believed that defendant would kill her. The complaint also described past incidents of domestic violence that included an incident from six months earlier during which defendant shoved plaintiff into a shelving rack. Plaintiff also described how defendant "harm[ed] himself and then call[ed] the police and [told] them pla[intiff] did it." However, the parties resolved that action through the entry of a consent order for civil restraints in an FD matter that was later dismissed.

After the parties divorced, on July 5, 2019, plaintiff filed another domestic violence complaint, alleging defendant committed the predicate offense of harassment on that day, after defendant stopped his vehicle at plaintiff's home and stated he was "tired of their daughters not talking to him and that [plaintiff] needed to get their daughters to talk to him"; and that if plaintiff did not "talk to

[defendant she would] be sorry." Plaintiff further stated that on that same day, defendant went to a local grocery store, where both of the children worked, and attempted to contact them. The July 5 complaint also described the earlier incidents of domestic violence.

Ten days after filing her new complaint, plaintiff amended it to add two other predicate offenses—terroristic threats and stalking, N.J.S.A. 2C:12-10. The amended complaint also set forth additional past events of domestic violence. Specifically, plaintiff stated that between April and June 2019, defendant appeared at plaintiff's house while she was outside and forced plaintiff to speak to him. She further stated that earlier in 2019, defendant came to the house and yelled at plaintiff, and plaintiff's vehicle got "egged on two occasions," which plaintiff believed defendant was responsible for.

At the ensuing trial, only the parties testified. In her testimony, plaintiff described the history of her relationship with defendant as "[u]nstable, rocky, [and] unpredictable," because defendant failed to understand right from wrong, he did not function well with the family, and he had issues with substance abuse involving alcohol and marijuana. She stated that the parties started having issues in their relationship approximately twelve years ago because of his

substance abuse and issues he had with their neighbors, including his "throw[ing] rocks and hav[ing] verbal confrontations with" them.

Plaintiff originally filed a domestic violence complaint in 2016 because defendant "had become extremely unstable mentally, and he was physically[,] . . . mentally and verbally harassing" her by threatening to harm her in text messages after she went out to dinner as alleged in the 2016 complaint. She also claimed defendant abused marijuana and alcohol, and he suffered from a bipolar disorder.

Plaintiff explained that she feared her life because defendant had previously pushed her in 2016, which led a police officer to respond to their house. Prior to the officer's arrival, defendant took a piece of the broken glass on the ground and cut his head with it purposely in order to "present that to the police" and make it seem like plaintiff "did it to him." Defendant "was escorted out of the house" after that incident. Plaintiff explained that the incident occurred because earlier in the day, defendant was erratic, arguing with plaintiff, that he did not want her to go to dinner.

Plaintiff next testified about the events in her July 2019 domestic violence complaint. She stated that defendant had "been harassing [her] several times while [she] was out on [her] front lawn." Plaintiff testified that between October

2018 until the TRO was granted, defendant drove past her house four or five times when she was mowing the lawn and an additional five or six times defendant would drive and yell from his car into her house.

On July 5, 2019, when defendant told her that she was going to "be sorry," plaintiff understood that as a threat and that he was going to harm her because he had previously been violent towards her and others. She explained defendant had been arrested in the past for his conduct towards others and charged with assault with a deadly weapon on two occasions relating to his threat to hit a neighbor with a hammer and chasing another person with a bat. She also testified that while the divorce was pending, defendant killed the dog of his then girlfriend. Plaintiff stated that she feared for her safety as defendant "was unstable and off of his medications . . . , and he was . . . living in a house where there were weapons."[2] Plaintiff also stated there were many instances that defendant came by her house unannounced after they were divorced, and he would yell for plaintiff and the children to speak to him.

On cross-examination, plaintiff stated that she never included defendant's act of killing a dog in her complaint. She further stated that when defendant

_____

[2] After defendant objected to this testimony, the court stated that it was not going to allow further testimony on that topic and would not consider that or the fact that defendant was off his medications in its decision.

pulled up to plaintiff's house, he stayed in his vehicle and yelled from across the street. She did not recall that defendant was in an arm sling, as he claimed, when he arrived at her house on July 5, 2019, that "he was disabled" at the time, or that defendant talked about finances. Plaintiff stated that she was alarmed when defendant yelled because he told her she had to help him see their children and if she did not help, she "would be sorry."

Plaintiff also confirmed that there was nothing prohibiting defendant from driving down her street or seeing the children, and she was unaware of anything in the MSA that prohibited defendant from coming to plaintiff's house. When defendant was in front of plaintiff's house, plaintiff was unaware if defendant possessed any weapons. She admitted that defendant's "parents live in close proximity to" her house, and passing her house is one of the routes defendant could take to reach his parent's house.

Defendant testified that there were no "prohibitions from [him] driving down [plaintiff's] street in" the MSA. Prior to the TRO in 2019, the parties' communications related to financial issues. Defendant explained that on July 5, 2019, he was driving home from the grocery store when he saw plaintiff getting out of the vehicle in her driveway, so he stopped to talk to her.

Defendant stopped to talk to plaintiff because he wanted to "explain to [plaintiff] that [he] was not going to be working for four months, and that it[ he was] going to be . . . a little bit delayed in the child support and alimony" because of the injury he sustained at work. After he informed plaintiff of his situation, according to defendant, plaintiff stated "no wonder why I haven't got paid child support and alimony for three weeks." He attempted to get plaintiff to agree to modify the alimony and child support payments, but plaintiff informed defendant that he was stalking and harassing her, and she was going to call the police on him, which caused him to leave. Defendant stated that he neither yelled nor threatened plaintiff, and the conversation lasted for approximately forty-five seconds.

Defendant further stated that he typically drove down plaintiff's street because his parents live "700 feet away," only "one block over." He also used that same route to get to his bank and the grocery store, which he stated was the quickest route. Defendant admitted to driving past plaintiff's house while she was mowing the lawn, he stopped to talk to her, and tried to "be nice." He was never informed or requested not to travel down that street but conceded that plaintiff did tell him not to come by the house. Defendant denied threatening or physically touching plaintiff on July 5, 2019. While he admitted to going to his

children's place of employment, he denied that it was right after he left plaintiff's house.

Addressing the 2016 incident, defendant denied that he was upset plaintiff was going to dinner but admitted to saying that he was "going to drag [her] out of there." He further denied assaulting his father as plaintiff alleged in her complaint, but he admitted that a police officer responded to the house. Defendant did not know why the officer responded to the scene, but he assumed it was because they were being loud. He further did not recall pushing plaintiff. According to defendant, plaintiff requested that defendant leave the house and he decided to leave "[t]o cool the situation down." When the police arrived at the house, his children became hysterical so either his sister or his father took the children. Defendant could not recall why his children were hysterical at the time, and he stated that they only became hysterical once police responded to their house. He denied using broken glass to cut his forehead and denied even having a cut on his head.

Defendant denied killing his former girlfriend's dog, but admitted to injuring the dog, which resulted in the dog having to be put to sleep. He admitted to receiving a ticket for animal abuse, and to being arrested for assault in the past. Defendant denied using a hammer or a bat to threaten anyone and stated

that he was charged with harassment instead of assault with a deadly weapon. Defendant also admitted that during the marriage, the police were only called to the house at most four times. He held plaintiff partly responsible for his strained relationship as the children were "poisoned by her." Defendant denied ever threatening plaintiff and saying he would take the children away from her, or using marijuana for "many years," and stated he was not a big beer drinker.

The trial court placed its decision on the record the same day. After the court found that plaintiff did "fall within the class of people protected by the [PDVA]," it made detailed findings about the parties' credibility. It stated that while plaintiff's demeanor was appropriate and she was a credible witness, defendant was "rather aggressive," "evasive[]," and not "entirely candid." The court concluded that defendant's testimony at times was "less than credible," and it accepted plaintiff's version of events.

Addressing whether plaintiff proved a predicate act, the court held that plaintiff failed to prove that defendant committed any terroristic threats as defendant's actions did not "necessarily connote[] that there's a threat to commit a crime of violence, nor [did the court] find that it was done with the purpose to terrorize" plaintiff. The court also did "not find that the elements of stalking

[had] been established," as there needed to be more than defendant "going past the house and calling out, saying hello, [and] stopping on this occasion."

Turning to the last predicate act, the court stated that defendant's July 5, 2019 statement that plaintiff would "be sorry," would ordinarily not be sufficient to establish harassment. However, defendant driving by plaintiff's house on multiple occasions, attempting to engage in conversation with plaintiff, and yelling into her house was sufficient to establish the predicate act under N.J.S.A. 2C:33-4(a) when considered in the context of the defendant's history of domestic violence as described by plaintiff. As to subsection (c), the court found that defendant's intention "was to cause annoyance or alarm to plaintiff," and the court "infer[ed] that . . . there [was] no other intention that one would assign to" defendant "driving by the home on multiple occasions, engaging . . . plaintiff, [and] yelling into the house." Accordingly, the trial court concluded plaintiff proved that defendant committed acts of harassment under both N.J.S.A. 2C:33-4(a) and (c).

The court then considered whether an FRO was necessary to protect plaintiff. It stated the following:

> [I]n determining whether or not there is a need for restraint the [c]ourt considers the factors that are enumerated in N.J.S.A. 2C:25-29(a) and perhaps most importantly . . . the previous history of domestic

> violence between the parties including threats, harassment and physical abuse, it also includes the existence of immediate danger to person or property, and . . . [it was] to consider the totality of the circumstances.

After reviewing the incidents of past domestic violence, the court concluded that defendant's "ominous threat" on July 5, 2019, in addition to the incidents that took place in 2016, placed plaintiff's "life, health, safety and welfare . . . in danger," warranting the entry of an FRO. This appeal followed.

Our review of a Family Part court's granting of an FRO is limited. "[W]e accord great deference to discretionary decisions of Family Part judges" given "the 'family courts' special jurisdiction and expertise in family matters.'" G.M. v. C.V., 453 N.J. Super. 1, 11 (App. Div. 2018) (first quoting Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012); and then quoting N.J. Div. of Youth & Family Servs. v. M.C., III, 201 N.J. 328, 343 (2010)). When reviewing "a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). We will "not disturb the 'factual findings and legal conclusions of the trial [court] unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably

12

credible evidence as to offend the interests of justice.'" Cesare v. Cesare, 154

N.J. 394, 412 (1998) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. of Am., 65

N.J. 474, 484 (1974)). Deference is particularly appropriate when the evidence

is testimonial and involves credibility issues because the trial court who

observes the witnesses and hears the testimony has a perspective that the

reviewing court does not enjoy. Cesare, 154 N.J. at 412; Pascale v. Pascale, 113

N.J. 20, 33 (1988).

"On the other hand, where our review addresses questions of law, a 'trial

[court's] findings are not entitled to that same degree of deference if they are

based upon a misunderstanding of the applicable legal principles.'" R.G. v.

R.G., 449 N.J. Super. 208, 218 (App. Div. 2017) (quoting N.T.B. v. D.D.B., 442

N.J. Super. 205, 215 (App. Div. 2015)).

In determining whether to issue an FRO, a court first must determine

whether the plaintiff has established, "by a preponderance of the credible

evidence, that" defendant has committed a predicate act of domestic violence as

defined in N.J.S.A. 2C:25-19(a). Silver v. Silver, 387 N.J. Super. 112, 125

(App. Div. 2006). The PDVA "defines domestic violence by referring to a list

of predicate [offenses] . . . found within the New Jersey" Criminal Code. J.D.

v. M.D.F., 207 N.J. 458, 473 (2011). "[T]he commission of a predicate act, . . . constitutes domestic violence . . . ." Ibid.

Harassment is one of the delineated criminal offenses under the PDVA. Harassment is defined as when "a person . . . with purpose to harass another . . . [m]akes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm"; "[s]ubjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so"; or "[e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." N.J.S.A. 2C:33-4(a) to (c).

Harassment requires the defendant to act with the purpose of harassing the victim. J.D., 207 N.J. at 486. "The question for determination, [therefore], is whether defendant [acted] . . . with the intent to harass." R.G., 449 N.J. Super. at 225; see also State v. Castagna, 387 N.J. Super. 598, 606 (App. Div. 2006) (stating a defendant's "'purpose to harass' is critical to the constitutionality of the harassment offense"). "'A finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience." H.E.S.

v. J.C.S., 175 N.J. 309, 327 (2003) (quoting State v. Hoffman, 149 N.J. 564, 577 (1997)).

Under the definition of harassment, "any other course of alarming conduct" and "acts with purpose to alarm or seriously annoy" are to be construed as "repeated communications directed at a person that reasonably put that person in fear for his safety or security or that intolerably interfere with that person's reasonable expectation of privacy." State v. Burkert, 231 N.J. 257, 284-85 (2017).

When considering whether a defendant's conduct arises to a criminal offense, courts should consider the context of the language used or of the acts committed. For example, in Peranio v. Peranio, 280 N.J. Super. 47, 55 (App. Div. 1995), we held that the words "I'll bury you" on their own were insufficient to meet the requirements of harassment under N.J.S.A. 2C:33-4(c). There, we found "absolutely no history of threats, harassment, physical or mental abuse or violence between [the] parties, who were on the threshold of dissolving their marriage when a conflict over property occurred." Id. at 56. However, we stated that those words if "manifested by a course or [combined with] repeated acts of alarming conduct," would be sufficient to support a finding of harassment as a predicate act. Id. at 55.

If the court determines a plaintiff established, by a preponderance of the evidence, that a defendant committed a predicate act of domestic violence as defined in N.J.S.A. 2C:25-19(a), it must then consider the factors enumerated in N.J.S.A. 2C:25-29(a)(1) to (6)[3] to determine whether an FRO is necessary "to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 125-27; see also A.M.C. v. P.B., 447 N.J. Super. 402, 414 (App. Div. 2016). "Commission of a predicate act is necessary, but alone insufficient, to trigger relief provided by the [PDVA]." R.G., 449 N.J. Super. at

---

[3] The six factors include:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety; and
>
> (6) The existence of a verifiable order of protection from another jurisdiction.
>
> [N.J.S.A. 2C:25-29(a)(1) to (6).]

228. Although that determination "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127. This "second prong . . . [under] Silver requires the conduct must [be] imbued by a desire to abuse or control the victim." R.G., 449 N.J. Super. at 228 (citing Silver, 387 N.J. Super. at 126-27); see also Peranio, 280 N.J. Super. at 52 (defining domestic violence as "a pattern of abusive and controlling behavior injurious to its victims").

Whether a defendant's conduct was designed to abuse or control the plaintiff should be assessed in the context of the "entire relationship between the parties." Cesare, 154 N.J. at 405. The court may also look to other relevant factors not included in the statute. N.J.S.A. 2C:25-29(a); N.T.B., 442 N.J. Super. at 223 (noting the statutory factors are "nonexclusive").

Whether a plaintiff has established an act of domestic violence had occurred is not determined in a vacuum. As we have stated:

> The law mandates that acts claimed by a plaintiff to be domestic violence must be evaluated in light of the previous history of domestic violence between the plaintiff and defendant including previous threats, harassment and physical abuse and in light of whether immediate danger to the person or property is present.

N.J.S.A. 2C:25-29(a)(1) and (2). This requirement reflects the reality that domestic violence is ordinarily more than an isolated aberrant act and incorporates the legislative intent to provide a vehicle to protect victims whose safety is threatened. This is the backdrop on which defendant's acts must be evaluated.

[R.G., 449 N.J. Super. at 228-29 (quoting Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995)).]

With these guiding principles in mind, we turn to defendant's contentions on appeal. Defendant argues there was insufficient evidence of harassment. According to defendant, the trial court did not consider his intention, purpose or motivation driving to plaintiff's house, and further, that there was no "objective or purpose to 'alarm or seriously annoy'" plaintiff. He claims that when he spoke to plaintiff briefly in July 2019, without leaving his vehicle, he only wanted to inform her that he "became disabled at work." Defendant also contends his actions were not "repetitive in nature," and he was "coincidentally" driving past plaintiff's house, as he did "on many occasions," while going to the bank, supermarket, and to visit his parents. Moreover, the statement that "you will be sorry" was not an ominous threat and under Peranio does "not rise to the level of an 'alarming conduct' with the intent 'to alarm or seriously annoy another'" under N.J.S.A. 2C:33-4(c).

Defendant also argues that the trial court improperly granted the FRO against him because there was no proof that plaintiff wanted an FRO or that one was necessary to protect her. Additionally, according to defendant, the trial court improperly stated that "during the course of the marriage the police were called to the residence at least four times." He asserts that of the four calls, only one related to his actions against plaintiff. Even with that one incident where the police responded, defendant contends "[t]here was a conflicting narrative as to what exactly transpired" that day. In the alternative, defendant contends that the matter should be remanded for further proceedings as plaintiff "never explicitly stated on the record that she . . . sought or needed an FRO." He argues that the trial court "did not complete a proper analysis or develop . . . full testimony with substantial evidence."

Having considered defendant's arguments in light of the credibility determination made by the trial court, as well as its factual findings to which we are bound on appeal, we affirm substantially for the reasons stated by the trial court in its oral decision. We only add the following brief comments.

Defendant's contentions on appeal ignore that the trial court correctly viewed his July 2019 confrontation with plaintiff within the context of the parties' history of domestic violence rather than viewing the facts in a vacuum.

19

Moreover, although plaintiff never testified that she wanted an FRO, she not only applied for the entry of that order, but also testified that she feared for her life, which caused her to file the domestic violence complaint on July 5, 2019. Based on the totality of the circumstances, the trial court was satisfied that there was a need for an FRO, as it found that defendant's conduct placed plaintiff's "life, health, safety and welfare . . . in danger." In doing so, the trial court satisfied its obligation under <u>Silver</u>'s second prong. The trial court's findings were supported by sufficient evidence in the record and its decision was not the result of an abuse of its discretion.

To the extent we have not addressed any of defendant's remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5220-18T1